Case number 24-1954, John Reinhart v. City of Birmingham, MI, or arguments not to exceed 15 minutes per side, Mr. McKinney, you may proceed for the appellant. Good afternoon, Your Honors, and may it please the Court, my name is Stephen McKinney, and I represent the plaintiff and appellant in this action, John Reinhart. At the outset, I would like to reserve three minutes this afternoon for rebuttal. The core issue that has us before the Court on this appeal is whether the City of Birmingham violated the Americans with Disabilities Act when it reconstructed the south end of its downtown, and it did four things. It drastically reduced the number of on-street parking spaces. It reduced the number of on-street handicap parking spaces. It eliminated a drop-off area that was used by disabled people to access portions of South Old Woodward. And it reallocated handicapped parking spaces within the existing configuration to move those spaces furthest away from buildings that people would have access to. Mr. Reinhart says yes, the City did violate those protections in the ADA. In particular, it violated two of the core promises of the ADA. It violated the promise that no person with a disability should be denied the benefits of government services. And it violated the promise that no person with a disability should be discriminated against by the government because of his or her disability. Those promises come from the statute itself, but they're also distilled well, I believe, in the rules interpreting the statute when the Department of Labor has said, anytime a government redesigns a public space, it must do so in a manner that makes it readily accessible to the disabled. And here the City's actions didn't do that. The trial court disagreed with us. The trial court held, for three reasons, granted summary judgment in favor of the City. It said Mr. Reinhart was not a qualified individual with a disability. It said there was no factual dispute. Whose obligation is it to prove that he's disabled? I believe it's our obligation. We don't need to prove that he's disabled. We only need to prove he's a qualified individual with a disability. The summary judgment, you had to put forth enough evidence that a jury could find that. Yes, we did, Your Honor. What evidence did you have? So we had evidence in the form of Mr. Reinhart's affidavit, Mr. Reinhart's deposition testimony, Mr. Reinhart's medical records, all of which showed his medical history. And it also showed that Mr. Reinhart, through his own deposition testimony and through his own affidavit, said he has difficulty walking long distances. Did he say how, like, you know, he said he had some, well, first of all, we know he's very active. He's very, I mean, hiking and all kinds of activity. But with respect, I think he said he can walk a half mile and then he has some pain. Did he quantify how much pain he has? Well, I don't know that he quantified how much pain, but I think it's important to note. I don't think he did. He also I think that's an important point. I don't think he did, I mean, he just sort of said, I have some pain. He didn't give us much more than that. Well, again, he says in there that it stops him from walking. He can't walk more than, if he walks a half mile, he has to stop, he has to stretch. He needs to, he can't, you know, continuously walk a mile. That was clear from his He stretches, he said that he can continue. He can continue on if he stretches. But I think it's important to note, too, he also says he can't do that unless he does his exercise regimen, which, again, is an ameliorative step he takes in order to be able to walk the limited distance that he can walk. And under the ADA and under the rules interpreting the ADA after the Amendments Act in 2008, you're not to look at those, the ameliorative efforts. Did he say that or did his doctor say that? I know there's this point from the doctor about do Pilates or you won't be able to walk. But he said that, too. He also testified, if I don't do the Pilates and I wake up the next day and I can't walk, or if I, you know, he also testifies that he sits incorrectly. Sometimes the next day he can't get up and walk. He has, he presented significant evidence from which to try our effect. Sometimes when we look at, you know, what assistance you need, it's do you need a physical, like a walker, or do you need a surgery or something. Exercise is a little harder to quantify in the definition of sort of what, you know, what's required assistance to perform daily functions. But I think he well described how that exercise does enable him to do those things and that without doing the exercise he can't do those things. I think he did so in his own testimony, too, not just relying on his doctor's statements in the medical records. Yeah. He says he does exercise and he says it helps him. Yes. You're saying there's actually, where is it in the record that he actually says, if I don't do exercise I can't walk? If you can give me a moment. No, that's okay. It's a pretty important point. I believe it is in, I'm sorry, I didn't mean to interrupt. That's okay. It's a pretty important point, but maybe on rebuttal you can get it or I'll do it. No, I can get you a direct cite, but he does testify in the record that if he doesn't do these things he cannot walk and can't walk even the half mile that he says he can walk on a good day. And I think it's important to note, too, just because he can do the exercises doesn't mean that he's not a qualified individual with a disability. And, again, the regulations interpreting the Amendments Act make clear that just because you can't do, because you can do one activity doesn't mean you're not a qualified individual with a disability. If it impacts a different activity in your life. So I do believe there was more than enough evidence put forward in the record for a jury to decide whether or not Mr. Reinhart was a qualified individual with a disability, and that the district court's decision was just a weighing of the evidence. It said we want to look at the exercise but not the walking or the limitations on the walking. How would you characterize the benefit that Mr. Reinhart was denied on account of his disability? Is it parking in one of the nine spots that was left as opposed to the ten? Was it access to this 555 building? Was it inability to use this loading dock, whatever it was? I guess I'm just wondering how you would characterize the benefit. I think the benefit is the access of close-by parking. And I think that was in his testimony that when he had days where he had problems with his back, he utilized that close-by parking. And I think he testified, and they put it in his affidavit, that it was sometimes the handicapped spaces and sometimes just the regular spaces as well. So the benefit itself is close-by parking. Close-by to the 555 building. Yes. And it's close-by to other buildings in downtown Birmingham as well. But his testimony was about 555. That's what I'm struggling with a bit, right? Yes. What you just hit on is if it's what you just said, I'm not sure that helps your client. I mean, if we're talking about the benefit being parking in the area, the alteration that was made, yes, there are many fewer spaces for everybody. One fewer space that is meant for disabled people, and all nine of those spaces that remain out of those ten are now ADA compliant. So it seems like, yeah, if we're defining the benefit as access to the 555 building, the client has a leg to stand on, but the Jones case and otherwise suggests that maybe we don't define it that way. But I think the problem with Jones is Jones has a question about reasonable accommodation. And Jones says, look, we've got a city regulation about how these parking spaces should be used, and this set of parking spaces is supposed to be for a limited time, and this set of parking spaces is for all-day parking. The all-day parking was too far away. And the plaintiff in Jones said, listen, I just want the parking spot by my place to be an all-day parking space. Here we're looking at a city that went and took the existing totality of parking spaces, significantly reduces it at a time when it's approving uses that are going to greatly increase the demand for those parking spaces. But it reduced spaces for handicapped and non-handicapped parkers. Is that correct? Yes, that's correct. Everybody was impacted. Everybody was impacted, but, again, people with disabilities don't always park in handicapped parking spaces. They sometimes would need to park in a close-by parking space. For instance, on a day that my client doesn't use a walker, he may park in a close-by parking space that gives him access to this area of South Old Woodward Avenue that he wouldn't have if he asked to park a half a mile away or in one of the neighborhoods or in one of the parking garages on the north end of town. Which is true for other people. It's true for everyone in the city. There's just less spots. It is true, but the ADA protects people with disabilities, and it guarantees them that the benefits of those areas shouldn't be denied to them because of the disability. You're under a consent decree that requires 25 to 1 or something, or spots, and this number falls well within that, right? Yeah. It's like a design guide from DOJ. This number also falls well. The ratio falls well within that. Correct. There's no dispute, but I think the larger question here is where you have a situation where the city is just taking away on-street parking, and on-street parking is the only thing that gets you close to this area of downtown. Are you saying that on-street parking is a facility? Are you saying it's a parking lot because it doesn't? No, it's not a parking lot. It's on-street parking. It's got to be a facility, right, for purposes of? It does, but that's what the Fort Huon case, Basilos, Hammond, Goodkitch, Meekins, all of those cases we cited in our brief all say that close-by on-street parking is a public facility. It is something that needs to be provided to the disabled. Most of the things are defined, though. You alter a parking lot or a road, but this is actually in between those. It did, but it altered a road that had existing parking spaces, and it took 37 percent of those parking spaces away. You define those spaces as a parking lot or as a road? I think those are the two terms that are in the statute of the reg. No, I don't believe that it's a parking lot as defined in the statute. No, I don't. The improvement was? A parking lot is one kind of facility. Yes, but it's a roadway with parking spaces on the roadway. That's the kind of facility. It just says road, I think. It does, but the fact that there are parking spaces on the road or available on-street parking has been recognized by a number of courts as being a public facility because it does. It's public access to the sidewalks that are adjacent to the parking spaces to the roadway. It's public access to the private buildings that sit back from the roadway. I guess just stepping back, it seems like a pretty sweeping rule that every time a city wants to enter into a beautification project or make significant changes to the layout of the city, that it would really be hamstrung if the rule is if it reduces at all. Even if it reduces by one the number of spots for disabled individuals or moves the general parking further away, even if it affects everyone sort of uniformly, that this is now an ADA violation. I think that it is an ADA violation. If you're doing it in a manner that is so substantial that it impacts the availability of a large percentage of the parking that's available, then I do believe you run afoul of the ADA. I see my time has expired, Your Honors. Any other questions you have? Okay. No. Thank you very much for your rebuttal time. Thank you. May it please the Court. Mary Massaran on behalf of the City of Birmingham. We ask this Court to affirm the District Court's order granting summary judgment to this city. The District Court correctly held that Reinhardt's claim lacks merit, both because Reinhardt is not a qualified individual under the Americans with Disability Act, and he provided no evidence of intentional discrimination nor any failure to reasonably accommodate Reinhardt. Reinhardt disagreed with the city's planned reconstruction, but that does not give rise to an ADA claim. It's an attempt to broaden the ABA to subsume disagreement with land use and zoning and planning decisions of municipalities that finds no support in this Court's authority or anywhere that I'm aware of. The project actually improved handicap access by making nine, we say 10, but we could accept nine for purposes of the argument this morning. When cities are thinking about these kinds of projects, what limits does the ADA place upon them, if any? Could they get rid of all parking spots so there's zero parking spots, which would include disabled individuals, non-disabled individuals? It seems to me in this case, if the city had gotten rid of all of its handicap accessible spots throughout this area of downtown, maybe that would be something to talk about. But that didn't happen here. And Reinhardt can park in all of the general spots, including all of the spots in the parking garage, which is private, but is part of the 555 building that he's the general manager of. He can also park in all of the public spots on the streets where they are. He can also park in the handicap spots because he has a handicap sticker, which he apparently got from the state of Florida, sort of ad infinitum or whatever, after one of his surgeries. But the fact that everybody now competes more for those available spaces does not amount to a failure to reasonably accommodate or to discriminate. And with respect to the loading area, I was rereading Zielinski's depth this morning, and one thing struck me, which I don't think I emphasized in the brief, and that is even the loading area, he complains, well, you can't be dropped off anymore, there's this loading area. Zielinski says, first of all, it was never a formally designated loading area. There's an area on the street, on Old South Woodward, I don't know if any of you have ever been there, but the street largely has angled parking along the street. There is an area where there is no parking allowed. So that area has informally been used as a loading and unloading to drop people at 555 Woodward or to go other places in that area when the person is being taken there and for whatever reason isn't parking. Using that area in the future as a bus stop doesn't impede other people stopping and loading and unloading in that area, except when the bus is there, which is very intermittent. And Zielinski sort of explains that in his depth. So each of the points that Mr. Reinhart wants to use are areas where if he were designing the project, he might have done it differently, but they don't show any animus on the part of the city against him or against the disabled, and they don't show... How do you understand? He's got this intentional discrimination claim, but setting that aside, how do you frame his other claim? Do you see it as a reasonable accommodation claim? I think he walked away from that, and I thought he said it was more of a general claim against the city for the city's overall, not sort of failing to accommodate his singular need, but broader considerations to the broader community. Is that how you understand his case? I think so. I think so. There are some cases that talk about reasonable accommodations, but they seem very narrow in their analysis of what that individual person needs and what the facilities allow for. Well, in part because he initially brought this suit together with several others, I think he tried to frame it a little more broadly than just this one individual. And then, of course, there were arguments raised in response to summary judgment changing it. So the district court looked and said, well, you pleaded discrimination, now you've raised this other argument. I agree. I tried to really focus on, well, what exactly is being raised, and what is the law, as I was preparing for argument, and I think it's a little bit unclear. But the district court said, well, we'll give you that. You did enough to raise this reasonable accommodation, and the district court looked at it, and I think the district court did a good job of looking both in terms of Reinhardt as an individual, but also just in general, and made the points that Judge Cole, for instance, made, that, well, it was a reduction for everybody, and I think you made those points as well, Judge Radler. Cole made them better, I'm sure. We both did. That this wasn't anything directed at him. It certainly wasn't anything directed at disabled people generally, and that it was a choice of the cities in redesigning the streetscape and the parking to deal with safety issues. Generally, part of what they wanted to do, and this is from Zielinski's record deposition, was to slow traffic. They didn't want people speeding down here because there's a lot of pedestrian traffic. People cross the streets not at the corner, and it's not a safe thing for it to be used as a through street. So they did a number of things, and in the course of doing that, they made some changes that resulted in less overall parking, at the same time enhancing the handicap access points, parking spaces, to bring them into compliance so they have the wider area that allows for compliance with the regulations. So just to circle back to Judge Radler's question about the framing and how we should construe his claim under 35.151, and I guess you're not arguing that there was a need for him to use any magic words or anything like disparate impact or anything like that in the complaint. He cited, as I understand it, the language of 35.151 and said there was a failure to make it readily accessible to and usable by individuals. I guess what I'm asking is, is your argument that however we construe it, he didn't prove the claim? Correct. I mean, I think the district court did a good job of sort of dealing with the shiftings of arguments, which sometimes happens in litigation. Of course, and you don't have a strong opinion on how we construe it. No. Do you agree with the district court in the ultimate conclusion? I think the district court did a really good job of going through the analysis, and I think the district court... Can I also, I want to follow up with another question that I think is related at least, which is can we assume for purposes without deciding, can we assume that he is an individual with a disability and then just resolve the case on the merits of the claim? Well, you certainly can, and the city would be content with that. There's no case law that says we can't do that, to your knowledge. Well, you can assume that and decide the case. I think you could do that. I don't believe he's qualified, and I think the best case, walking through a record dealing with, I think it was sleep apnea, but a comparable record where you have a statement by a person, and some medical evidence that doesn't show enough to be a qualified individual was an unpublished case by the court that was issued in... Excuse me. Neely v. Benchmark Family Services, 940 Fed Appendix 429. Judge McKeague wrote that opinion, and I think the same kind of record was there, and he looked at the two prongs of what you have to show to show that somebody has been disabled and that the disability constitutes a substantial limitation on a major life activity, and concluded that that plaintiff didn't meet the test. So here, from a decision tree standpoint, the plaintiff has to win on both of those points, and either one of those points would be sufficient to affirm the district court, and the city would be happy to be affirmed on all the grounds or either one. I'll be the right answer. Yes. I see that I have time left, but I don't want to take the court's time on this necessarily, and I feel like I don't have a lot more to offer unless you have questions. Well, thank you very much for your argument, and we'll hear rebuttal. Thank you, Your Honors. I first wanted to ask or answer Judge Radler's question about the portion of the transcript where Mr. Reinhart said it was from his deposition that without exercise he would not be able to walk or stand straight. That was record 74-6 from the lower court record, page ID 2415. Thank you. And that was his deposition testimony. I want to make a clarification on the record. The loading area itself, prior to the construction project, the loading area was probably about 20 feet long. It was right next to the 555 building. It allowed a car to pull up, drop people off, or you could park there for a brief time if somebody had to run in or something like that. I think Mr. Zegelman, who was an original plaintiff, said he occasionally did actually walk with a cane. That area is gone. It's replaced with a sidewalk, essentially, and the bus stop that's located in that same area now, actually the bus just stops in the middle of the street, and it lets passengers off. It can't function as a drop-off point for handicapped individuals like it had in the past. It can't do that because you're dropping people off in the middle of the street, not in a stop sign or anything like that. I didn't think that you had really cited this removal of the loading dock as a reason for your 35.151 claim, maybe for the animus claim. I think we did for the disability claim as well, or the failure to make it accessible to the disabled claim as well, because it does. Again, we had Dr. Anderson's affidavit in there where he said he has a practice in the 555 building. When he has disabled patients come, they use that parking area to be dropped off, especially patients he has sometimes in wheelchairs use that because it's closest to his building. One last question. It wasn't clear to me how much farther away the nine handicapped spots were relocated. It reduced from ten to nine, and then you take the position that the nine were moved farther away. They're not half a mile away. No, they are not half a mile away. If you take a look at the drawing that was used to present the plan that was part of the lower court record, you can see the one handicapped space goes to the absolute furthest southern end of where the parking spaces are. That's an area that has a triangular piece of property owned by the city. It's grass and benches, and it's sort of a park without any real amenities. There's no way to access the building. It's further away from any type of building in the area than it was previously. So that's where those benches were moved. Well, the records show me, I guess I'm just trying to figure if it's just sort of a couple of spaces shifted away, or is it a significant difference? I believe it is. I know significant is all in the how you want to define it, but I'm just trying to get a sense how far. I think it's more than 50 feet for certain. It's not a half mile or a quarter mile. That's the entire distance of the project. But it's several feet. In fact, I would say it's probably more than close to 100 feet, because it goes from kind of north end of the parking bay to the far south end of the parking bay where there are no buildings. Did you have one more point you want to make? We took a lot of your time. No, I appreciate that, Your Honor. I just want to, again, confirm with the court that you were able to access those meeting videos. I know there was a question in the lower court about whether the court was able to access the meeting videos. We cited them in our brief. We provided a link. I checked the link yesterday. It still worked. I would encourage the panel to listen to those. Is this for your intentional discrimination? This is for the intentional discrimination claim. Remarks made by the city council members or something. People can walk. It's good for them or something. Yes, exactly. I want to make sure the panel can listen to those comments. If there's any problem in accessing them through the YouTube site, I'd be happy to provide them some other way. I know there was a question raised by the district court that the website didn't work anymore. They did move to a different website. I just want to make sure the panel has access to that. If there's any reason why we would need to send it to you separately, it is part of the record. I believe we made enough to make it part of the record. Is there any one aspect? There are a number of council members who spoke, as I recall. Is there anything in particular you want to point us to? Just the totality of the comments? I guess I didn't hear anything that I thought rose to the level of intentional. I think when you hear, for instance, Commissioner Boutros, when he gives his statement and he says, your customers are healthy, they like to walk, they'll get used to it. You can hear somebody from the audience say, well, what happens to the people who can't walk? And that's how I think when you have a statement like that, it's made in an open meeting. The commissioners knew about it, and that's what the ADA is supposed to protect. What happens to the people who can't walk? And that's why we think the city violated the ADA in this project. Okay, well, thank you very much. Thank you very much. We appreciate the arguments, and the case will be submitted.